# EXHIBIT A

**Cosi, Inc. Foodservice Distribution Agreement**

**Schedule**

| | |
|---|---|
| **DMA:** | Distribution Market Advantage, Inc., 1515 Woodfield Rd., Schaumburg, IL 60173. Email: dan.cox@dmadelivers.com. |
| **Distributors:** | Ben E. Keith Company, 7600 Will Rogers Blvd, Ft. Worth, TX 76140. Email: cslewis@benekeith.com. |
| | Gordon Food Service, Inc., 1300 Gezon Parkway SW, Wyoming, MI 49509.Email: brian.larsen@gfs.com. |
| **Customer:** | Cosi, Inc., 294 Washington St, Suite 510, Boston, MA 02108, Attention: VP Supply Chain |
| | Email: Jennifer.Silveira@getcosi.com |
| | With copy to: |
| | Cosi, Inc., 294 Washington St, Suite 510, Boston, MA 02108, Attention: General Counsel, Email: vbaue@getcosi.com. |
| **Restaurant Concepts:** | Cosi |
| **Units:** | See attached exhibit entitled Units under Cosi, Inc. Foodservice Distribution Agreement |

**Products:**

| Item: | Per Case Fee |
|---|---|
| All Products except Products sold under Agency Billing Programs, as defined in the section titled "Pricing". | $2.38* |

*if sold as a split case, per unit of sale

Products sold under Agency Billing Programs, as defined in the section titled "Pricing", shall be sold at the price Customer has negotiated with the Suppliers under such programs.

Products sold under Agency Billing Programs, as defined in the section titled "Pricing", shall be sold at the price Customer has negotiated with the Suppliers under such programs.

**Diesel Fuel Adjustment Per Case:**

| Diesel Fuel Cost per gallon | Surcharge (Credit) per Case |
|---|---|
| Each $0.10 (or part of $0.10) below $2.50 | ($0.01) |
| $2.50 to $3.50 | None |
| Each $0.10 (or part of $0.10) above $3.50 | $0.01 |

Any fuel surcharge or credit will be added to or subtracted from the Per Case Fee for Product sold as full cases or split cases based upon their unit of sale

**CPI-U Adjustment:** $0.02 increase in the Per Case Fee for each full or split case for each 1% increase in the CPI-U

**Average Cases Per Delivery Adjustment:**

| Average Delivery Size in Cases | Adjustment in Case Fee |
|---|---|
| 106 cases and above | ($0.05) |
| 95 cases to 105 cases | None |
| 94 case to 91 cases | $0.05 |

**Units Serviced Adjustment:**     Should the number of Units serviced fall below 90 Units, the Case Fee will be increased by $0.10 Case.

**Proprietary Product Reduction Incentive:**     For each 20 case reduction in the number of Proprietary Products that we stock for you in any distribution center, we will reduce the Case Fee by $0.01 for Units serviced by that distribution center, as described in the section titled **"Proprietary Product Reduction Incentive"**.

**Term:**     March 1, 2016 – February 28, 2020 at 5 p.m. Central time

**Payment Terms:**     7 days from receipt of invoice via electronic funds transfer (EFT)

**Key Performance Indicators:**

| | |
|---|---|
| **Minimum Percentage of Orders Placed With e-Advantage®:** | 100 % |
| **Minimum Delivery Surcharge:** | Orders less than 60 Cases/unit of sale will be subject to a $75.00 delivery charge |
| **Maximum Deliveries Per Unit Per Week:** | 2 per week |
| **Current Average Delivery in Dollars:** | $2,700 |
| **Minimum Average Cases Per Delivery:** | 71 cases/ units of sale |
| **Maximum Number of Proprietary Product Items (as defined in Section 12.2):** | 232 items (149 dry, 48 frozen, 35 refrigerated) |
| **Maximum Number of Supplier Contracted Product Items (as defined in Section 9.6):** | 240 items |
| **Minimum Proprietary Product Inventory Turns Per Year:** | 12 annual turns |
| **Maximum Cubic Feet Per Case:** | 3.0 cubic feet |
| **Maximum Average Cubic Feet Per Case:** | 1.3 cubic feet |
| **Current Average Cost Per Case:** | $37.91 |
| **Maximum Weight Per Case:** | 50 pounds |
| **Number of Distribution Centers at Commencement Date:** | 6 distribution centers |
| **Number of Units at Commencement Date:** | 99 Units |
| **Current Average Distribution Center Spoke Miles At Commencement Date (Average distance of all Units serviced from a Distribution Center):** | 157 miles |

{00119451 3}

- 2 -

**Maximum Geographic Coverage Area:**     Coverage area for the 6 distribution centers utilized
                                          by the 3 Distributors.

**Distributor Service level Requirements**

Delivery fill rates 99.5%

Non - Key Stop Deliveries   +/- 1 hour from scheduled time

Key Stop Deliveries delivered before 5:30 a.m.

Table of Contents

1.    Primary Distributors.
2.    Term of Agreement.
3.    Units.
4.    Account Management.
5.    Usage Reports and Data.
6.    Ordering Procedures.
7.    Procedures Manuals.
8.    Deliveries.
9.    Pricing.
10.   Supplier Contracted Cost.
11.   Adjustments.
12.   Proprietary Products.
13.   Proprietary Product Reduction Incentive.
14.   Invoicing and Payment Terms.
15.   Key Performance Indicators and Other Critical Criteria.
16.   Price Audit.
17.   Price Verification.
18.   Credit and Collection.
19.   Termination.
20.   Warranties.
21.   Indemnification and Claim Limitations.
22.   Confidentiality.
23.   Distributor Liability.
24.   Insurance.
25.   Recalls, Holds, Inspections, and Product Withdrawals.
26.   Force Majeure.
27.   Contract Interpretation.
28.   General.

DMA and Distributors ("we" or "us") agree to furnish foodservice distribution of the Products and related services to Customer ("you") for the Restaurant Concepts located at the Units during the Term of this Agreement as follows. "Units" shall mean all locations under this Agreement: (1) owned and operated by Customer or (2) owned and operated by a franchisee of Customer that orders Products from Distributors (each a "Franchisee"). Capitalized terms are defined either in the Schedule or in the section where first used. We acknowledge and agree that Customer shall have no liability whatsoever for any obligations of any Franchisee, and that each Franchisee shall be solely liable for its obligations under this Agreement pursuant to such Franchisee's Acceptance form.

1. **Primary Distributors.**

   1.1.  We accept your appointment as your primary distributor for the Restaurant Concepts operated at the Units. We will sell you (and each Franchisee) will purchase at least 90% (by selling Price) of your and the Franchisees' requirements, in the aggregate, for the Products at the Units from us during each calendar quarter of the Term.
   1.2.  You acknowledge that DMA is solely the marketing and coordination organization for the Distributors, and that the Distributors, and not DMA, will sell and deliver the Products to you. Accordingly, you acknowledge that all of our rights and obligations under this Agreement are rights and obligations of the Distributors, and not DMA, unless specified otherwise.

2. **Term of Agreement.** Our obligation to furnish foodservice distribution of the Products and related services will be in effect for the Term specified in the Schedule.

3. **Units.**

   3.1.  You have the right to add Units within our then current distribution service areas by notice to us. DMA will furnish you with a description or map of each Distributor's service area at the commencement of the Term of this Agreement, which are attached as **Exhibit A** hereto, and thereafter upon your request.
   3.2.  You have the right to request us to add Units outside of our then current distribution service areas. Upon your request, DMA will use commercially reasonable efforts to solicit a distributor to service the outside Units from among the Distributors, other DMA distributors not a party to this Agreement, or other distributors in the area.

3.3. Each Franchisee participating under this Agreement will be required to sign an Acceptance of Foodservice Distribution Agreement by Franchisee ("**Acceptance**") in the form attached as **Exhibit B** hereto prior to making purchases under this Agreement. Credit terms offered to each Franchisee will be independently determined by the Distributor serving it. If the Franchisee is already making purchases under the expiring agreement at the time Customer enters into this Agreement, we will send each Franchisee the Acceptance and allow them a reasonable period of time, but not to exceed 60 days, to sign and return the Acceptance under this Agreement, during which time such Franchisees will be permitted to continue making purchases, subject to the other terms of this Agreement. You agree to use commercially reasonable efforts to assist us in obtaining signed Acceptances from each Franchisee.

3.4. If you have Franchisees who are terminated or are in default under their respective franchise agreements, you have the right to direct us to cease distributing Products under this Agreement to any such Franchisees (as you specify) or otherwise direct us with regard to distribution services under this Agreement to those Franchisees. You indemnify us for any loss, damage, or expense (including reasonable attorneys' fees) arising from or related to: (1) ceasing distribution to any Franchisee under this Agreement at your direction; or (2) any other action or inaction taken by us against a Franchisee under this Agreement at your direction. The foregoing indemnification obligations shall survive the termination of the Term or expiration of this Agreement.

3.5. Pursuant to your franchise agreements with your Franchisees, you have designated DMA as a "Preferred Vendor", and you have authority, as the "franchisor", to negotiate the terms and provisions of this Agreement for the benefit of your Franchisees, excluding any credit terms which we will determine for Franchisees as set forth herein. Each such Franchisee that enters into an Acceptance form shall have the Franchisee rights and obligations under this Agreement with respect to the Products ordered by such Franchisee. We and the Distributors acknowledge and agree that Customer shall have no liability whatsoever for the obligations of any Franchisee under this Agreement.

4. **Account Management.**

4.1. DMA will serve as the central contact for the administration of this Agreement.

4.2. DMA will appoint an Account Executive as your single contact to manage this program. Sales professionals at each of our distribution centers will be responsible to the DMA Account Executive for the purposes of this program. DMA will also appoint a National Account Coordinator to expedite communications within the program.

4.3. Each Distributor will assign an Account Executive and Customer Service Representatives to each Unit, and it will be their responsibility to maintain contact with the Unit with regard to service levels.

4.4. DMA will coordinate the implementation and maintenance of this program between the Distributors and you, including development of a transition plan, assignment and reassignment of Distributors and distribution centers to Units, program planning and meetings, development of order guides, development of procedures manuals for the Units, implementation of Supplier contracts for contracted Products, and review of service levels, inventory management, and problem resolution between our distribution centers and you.

4.5. DMA will serve as the "clearing house" for program communications such as Product requirements, Unit changes, new Product rollouts, inventory issues, Product code changes, and any other issues requiring system wide communications.

4.6. DMA will schedule periodic business review meetings to review performance against your goals and requirements, as well as the performance of the Distributors, and the status of the Key Performance Indicators described in the Schedule.

5. **Usage Reports and Data.**

5.1. You will be furnished at no additional charge with our standard usage reports generated by e-Advantage®, our web based order entry and reporting system. DMA will make customized reports available to the extent practicable, but such reports will be at specified additional cost to you. DMA shall not create for you or make any customized reports available to you unless the specified additional cost has been communicated to you and agreed upon by you in writing prior thereto.

5.2. Upon your request, DMA will provide Information (as defined below) to a third party you specify for the purpose of information analysis, order placement or processing, or supplier rebate application. "**Information**" means usage reports, data, and other information regarding this program provided by DMA to you or your designated third party. The Information will be made available in our standard formats. All Information we send to your designated third party is for your sole use. Selling, utilizing, or disclosing the Information by us or you to anyone other than to you and your designated third party is prohibited. Prior to providing any Information to your designated third party, the third party will sign a confidentiality agreement, in a form reasonably requested by Customer and DMA.

5.3. All transactional and Product Information contained in the reports provided by DMA and the Distributors to you is owned by you and is your property. The report formats are owned by and are the property of DMA and the Distributors.

5.4. DMA will use commercially reasonable efforts to collect and process Information in an accurate manner and will correct any errors, omissions, or defects in the Information within 30 days after notice of the error, omission, or defect from you. The correction methods and procedures will be determined by DMA, in its sole discretion. However, unless and except to the extent due to the willful misconduct of DMA or the Distributors, neither DMA nor the Distributors are liable for any loss, damage, or expense arising from or related to: (1) loss or corruption of data; (2) errors in data mapping or data input; (3) errors, omissions, or defects in the Information not described in a notice from you; or (4) any action or failure to take action by you in reliance on the Information. Nothing in this Section 5.4 modifies, amends or alters the rights of either party as outlined in Section 16 (Price Audit) below.

6. **Ordering Procedures.**

   6.1. In order to permit us to capture efficiencies in the supply chain for you, you and each Franchisee agree that the Units will place orders through e-Advantage®. A standardized order entry format approved by you will be implemented across all our distribution centers. Each Distributor will have the right to charge an additional fee equal to $15.00 for any orders not made through e-Advantage® or other electronic means agreed upon between you and the Distributor.

   6.2. Units placing orders below 60 case/unit of sale will be subject to the Minimum Delivery Surcharge shown on the Schedule.

   6.3. Order guides will be categorized utilizing your chart of accounts.

7. **Procedures Manuals.**

   7.1. Each Distributor will supply you and each Unit the Distributor serves with a detailed procedures manual. The procedures manual will cover key contacts at the distribution center that service the Unit, the e-Advantage® system, and the Distributor's procedures for ordering, delivery schedules, delivery procedures, key drops, receiving, credit memos, pick-ups, Product returns, recalls, etc.

   7.2. The procedures manuals will establish the course of performance, course of dealing, and usage of trade between you and each Distributor. Each procedures manual will be updated any time a change in procedures is made.

8. **Deliveries.**

   8.1. We will make deliveries to the Units at the frequency specified in the Schedule, unless we specify otherwise (with your approval) at time of order.

   8.2. The delivery schedules prepared by each Distributor will take your and each Franchisee's needs and preferences into account. The delivery schedules may be modified from time to time by us, either temporarily or permanently, with your approval, which approval will not be unreasonably withheld, with reasonable notice to the affected Units.

   8.3. Key drop delivery schedules will be developed for the Units, where allowed by the landlord and any building and municipal code. Normal delivery windows will be 10:00 p.m. to 5:30 a.m. and 2:00 p.m.to 5:00 p.m. seven (7) days per week.

      8.3.1. We recognize that some Units may have delivery restrictions imposed by public authority and/or outside landlord. We will work to accommodate such circumstances when notified by you to the extent practicable. Should such accommodation require additional expense on our part, such expense shall be discussed with you and may be added to each invoice as an additional charge for that Unit or handled in some other manner as mutually agreed.

      8.3.2. You will provide lock, key and alarm changes as well as key(s) via overnight delivery or other means acceptable to us, at your expense, to us at least forty-eight (48) hours prior to dispatch. The procedures manual will set forth further policies on key drop deliveries, including (as appropriate) key drop bonding, alarm violations, loss of keys, etc.

   8.4. You and the Franchisees will attain the Minimum Average Cases Per Delivery specified in the Schedule, calculated as the average of all Units and measured by calendar quarter.

   8.5. We will use commercially reasonable efforts to attain 99.5% (by case) order fill rate within one business day of order if you are delivered on a next day basis or two business days if you are delivered on a skip day basis with either the Product you ordered or a substitute approved by your authorized representative, subject to the section titled "Force Majeure". Order fill rate will be calculated as the average of all Units and measured by calendar quarter. We, on behalf of DMA and the Distributors, acknowledge and agree that you may refuse to pay for any products that are not either (a) on an Order Guide, or (b) approved in writing by your Support Center.

{00119451 3}                                     - 6 -

8.6. Each Unit must provide us with notice of any delivery of non-conforming Products, or shortage, loss, or damage of Products, upon receipt of the Products and before our driver leaves the Unit (except for key drop deliveries).

8.7. If a Distributor makes a key drop delivery to a Unit, the Unit will be conclusively deemed to have received and accepted the type and quantity of Products shown on the Distributor's invoice or delivery list left with the Products (even though the invoice or list was not signed by it), unless the Unit gives the Distributor notice of non-conforming Products, or shortage, loss, or damage, by 2:00 p.m. the day of delivery. Given notice, as outlined in this paragraph, Distributor will (via fax or some other mutually agreed upon method) acknowledge such notice by 5:00 PM the day of delivery. A key drop delivery means a delivery made by a Distributor to a Unit when none of the Unit's employees in charge of receiving is present. You and the Franchisees agree to cooperate with us in maximizing key drop deliveries if requested by a Distributor.

8.8. If no notice of non-conforming Products, or shortage, loss, or damage (excluding hidden damage that cannot be readily seen) of Products is given by the times specified in this Agreement, you and each Franchisee waive any right to assert such matters.

    8.8.1. Hidden damage claims need to be submitted within 72 hours of the delivery, except for produce items, which must be made the day of delivery.

8.9. If there is a shortage of Products at any distribution center, we will notify you, and we reserve the right to allocate Products distributed by us among all of our customers in our sole discretion. If the shortage is a Proprietary Product, we will allocate Proprietary Products in the affected distribution center among all Units serviced by the distribution center in a commercially reasonable manner, taking into account the proportion of total sales to each Unit, unless directed by you to allocate in a different manner, which shall consider Distributor's needs for effective recovery.

8.10. We may, at our option, agree to accept Product returns from you for reasons other than our delivery error. The Products must be non-perishable, in unopened full cases, and in good condition with adequate shelf life remaining to allow for resale. To defray our additional handling expense for the return of the Products, we have the right to charge a restocking fee of 15% of the selling price. Returns of certain Products, including seasonal, special order, discontinued, or promotional Products, will not be accepted unless the manufacturer or supplier of the Products ("**Supplier**") agrees to reimburse us for our selling price and all other expenses involved in the return.

8.11. Our product recall information is addressed in the procedures manual and contains a list of emergency contacts.

## 9. Pricing.

9.1. Pricing Mechanisms. The following pricing mechanisms ("**Pricing Mechanisms**") shall apply to determine the Price of the Products.

    9.1.1. Pricing Based Upon a Case Fee. The Price for a case of the Products is our Cost for a case of the Product, as defined below, plus the Case Fee specified in the Schedule. If a Product sold is not listed on the Schedule, the Case Fee for it will be provided to you by the selling Distributor at time of order.

        9.1.1.1. For example, the Price for a case of Product with a $2.38 Case Fee would be calculated as Cost of the case plus $2.38. A Product with a $30.00 Cost of case would have a Price of $32.38 ($30.00 + $2.38 = $32.38).

        9.1.1.2. A split case will be sold at the same Case Fee shown in the Schedule for the Products sold in full cases.

        9.1.1.3. Catch Weight Product Pricing on a Case Fee Program. The Price for a Product with a variable case weight ("**Catch Weight Product**") is our Cost, as defined below, plus the Case Fee converted to a Cents Per Pound Fee based upon the average case weight of the Catch Weight Product. The average case weight shall be based on the average of case weights for the Catch Weight Product in preceding periods as reasonably determined by the servicing Distributor.

            9.1.1.3.1. For example, the Price for a pound of Product with $3.00 Cost per pound and a $2.38 Case Fee with an average case weight of 20 pounds would be $3.12 per pound ((($3.00 x 20) + $2.38) / 20 = $3.12 per pound). The Cents Per Pound Fee would be $0.12 per pound.

9.2. Agency billing programs, including Coca-Cola, Pepsi Cola, Ecolab, and Starbucks, ("**Agency Billing Programs**") provide for the Distributor to receive agency payments directly from the manufacturer or supplier as compensation for distribution services. These Products will be sold at the price that you have negotiated with the manufacturer or supplier without any additional charge.

9.3. To simplify pricing, receiving, and inventory valuation, we round all Prices with calculated penny fractions to the next highest penny per unit of sale.

9.4. In areas where dairy pricing is controlled by the state dairy advisory board, including California, Colorado, Nevada, and Pennsylvania, dairy Products will be sold at the posted pricing.

9.5. Certain Distributors may offer the same or similar Products at a retail or wholesale store ("**Store Purchases**"). Because Products are offered in less than full case quantities, Store Purchases may not have the same Price as provided in the section titled "Pricing".

9.6. "**Cost**" is defined as the cost from the invoice of our manufacturer or supplier ("**Supplier**"), plus Applicable Freight, less any Supplier's promotional allowances reflected on the Supplier's invoice and designated for the end user. However, no freight will be added to the Cost of Supplier Contracted Items if freight is already included in the contracted pricing of such items. "**Applicable Freight**" means a freight charge for delivering Products to the Distributor. Applicable Freight charges may include common or contract carrier charges by the Supplier or a third party and charges such as fuel surcharges, cross-dock charges, unloading and restacking charges, container charges, air freight charges, assessorial costs, redistribution charges, and other similar charges not included in the Supplier's invoice cost that are required to bring Products into the Distributor's distribution center. "**Supplier Contracted Items**" means Products which are subject to pricing agreements between Customer and the manufacturer or supplier of such Products.

9.7. Cost is not reduced by cash discounts for prompt payment. Cost is also not reduced for payments which are earned, such as performance-based incentives, or fees we receive for marketing, freight management, warehousing, distribution, or quality assurance services we provide to our Suppliers.

9.8. Cost for freight we arrange will not exceed the cost stated in the Supplier's delivered price list or the Supplier's published freight schedule (or, if neither is available, the current market rates established by recognized common carriers). Freight for transfers between a Distributor's distribution centers (or from one Distributor to another) necessary to provide Products to your Units will be included in Cost.

9.8.1. We will notify you in advance and provide you with the cost prior to any transfers being made. If you do not approve the cost, the transfer will not be made.

9.9. The Cost for Products sold to Units located in the state of Washington shall include any Business and Occupation Tax levied on the sale as a component of Cost.

9.10. Costs for Products are recalculated with the following frequencies:

9.10.1. Time of sale pricing will be used for price sensitive Products with volatile fluctuations in pricing (including produce and fresh seafood).

9.10.2. Weekly pricing will be used for commodity Products which reflect declines and advances in Cost on a regular basis (including most protein Products).

9.10.3. Monthly pricing will be used for Products with a fairly stable pricing for extended periods (including most canned Products).

9.11. Adjustments to Product Prices will follow general market declines and advances. Variances can occur to the invoiced Price due to starting and ending dates of contract pricing, as described in the section titled "Supplier Contracted Cost". If there is a major (more than 10%) increase in the Cost of any Product during a pricing period, we have the right to make an immediate adjustment in the Cost of the Product, effective as of the beginning of the next week following the week during which the increase occurred upon written notice to you. If there is a major (more than 10%) decrease in the Cost of any Product during a pricing period, we will make an immediate adjustment in the Cost of the Product, effective as of the beginning of the next week following the week during which decrease occurred. For purposes of this Section 9.11, written notice may include email.

9.12. Prices do not include taxes or other governmental charges imposed on the Products. We will invoice for any taxes or charges together with penalties and expenses, if any. If applicable, you or the applicable Franchisee will provide us with a tax exemption certificate acceptable to the taxing authority.

9.13. If you seek to introduce any outside parties into your relationship with us, such as purchasing consultants, technology providers, back office systems providers, third-party logistics providers, or any other third party, and as a result, we experience a negative economic impact on our earnings from this program, such as increased costs or loss of revenue, then we have the right, upon 30 days prior notice to you, to adjust the Pricing Mechanisms in a reasonable manner to eliminate the negative economic impact, beginning at the end of the 30 day period. The notice shall include a description of the negative economic impact and the adjustment to the Pricing Mechanisms, all in reasonable detail.

## 10. Supplier Contracted Cost.

10.1. You have the right to negotiate your Cost of a Product directly with the Product's Supplier for up to the Maximum Number of Supplier Contracted Product Items specified in the Schedule. Each separate SKU counts as a separate item. Supplier agreements include agreements establishing the guaranteed Cost the Supplier will charge us for Products to be resold to you, and agreements granting Allowances to you. "**Allowances**" are off-invoice allowances, bill-backs, and other special arrangements granted by a Supplier to you.

10.2. The contract Cost you negotiate will be used to calculate the Price of the Product (so long as we have been notified appropriately), regardless of our Cost.

10.3. We will provide for a Supplier Allowance for a Product by deducting the Allowance value from the Product's Cost before the Price of the Product is calculated.

10.4. If a Supplier's Cost or a Supplier Allowance is premised upon specified payment or credit terms or specified purchase volumes of Products, the payment and credit terms must be consistent with industry standards for the Supplier and the specified purchase volumes and brackets must be consistent with your historical or reasonably forecasted purchases of such Products for all Customer and Franchisee Units. We are not required to purchase more than **3 weeks average** supply of any Product.

10.5. You must provide us with copies of the agreements you have with Suppliers for the purchase of Products, and also complete the DMA Contract Form for contracted Cost (forms furnished on your request). The agreements and forms must be transmitted to us by email or electronically. If we do not receive the copies and completed forms, we will default to calculating the Price of the contracted Products using our actual Cost as described in the section titled "Pricing". You must submit revisions in the contract Cost to us by the 15th of the month to be valid for the next month. If we fail to receive the revisions by that date, no change in the contract Cost will be made for the next month.

10.6. We are not responsible for inaccuracies, errors, or omissions made by your contracting Supplier in the billing of the pricing and Allowances, and your sole remedy for any inaccuracies, errors, or omissions shall be against the Supplier. If we become aware of any inaccuracies, errors or omissions by your contracting Supplier, we will use commercially reasonable efforts to notify you of same.

10.7. If your contracting Supplier provides both the Product which you specified, and also an equivalent Product which is branded to a Distributor, that Distributor has the right to provide its equivalent branded Product to you so long as: (1) you have approved the equivalent branded Product for purchase; (2) the Supplier agrees that the contracted pricing can be applied to the equivalent branded Product; and (3) the equivalent branded Product is stocked by a Distributor servicing any Unit.

11. **Adjustments.**

11.1. Diesel Fuel Adjustment Per Case. You acknowledge that the cost of diesel fuel is a critical cost component that is beyond our control. We will assess a surcharge per unit of sale, or apply a credit per unit of sale, as a separate line item on each invoice, if the diesel cost is outside designated limits, all as specified in the Schedule.

11.1.1. The diesel cost will be based on the U.S. Average for Retail On-Highway Ultra Low Sulfur Diesel Price per Gallon for the continental United States as published by the United States Energy Information Agency (website http://tonto.cia.doe.gov/oog/info/wohdp/diesel.asp.), or another similar index reasonably chosen by us and agreed upon by Customer, such agreement not to be unreasonably withheld. The average of the diesel cost for the first 10 weeks of a calendar quarter will apply to the next quarter.

11.1.2. For example, a diesel cost of $3.59 per gallon will require a surcharge of $0.01 per case/ unit of sale and a cost of $2.49 per gallon will require a credit of $0.01 per case/unit of sale

11.2. CPI-U. The Case Fee and Cents Per Pound Fee set forth in the Schedule shall be adjusted effective on each anniversary of the commencement date of the Term of this Agreement to reflect the percentage increase, if any, in the CPI-U for the second month prior to the month containing the anniversary date, over the CPI-U for the second month prior to the month containing the commencement date. The amount of the adjustment is specified in the Schedule. CPI means the unadjusted Consumer Price Index for Urban Wage Earners and Clerical Workers (Series ID CWUR0000SAOL1E), "all items less food and energy", National/U.S. City Average (1982-84 = 100), published monthly by the Bureau of Labor Statistics of the United States Department of Labor (http://www.bls.gov), or, should that index become unavailable, another similar index reasonably chosen by us and agreed upon by Customer, such agreement not to be unreasonably withheld.

11.2.1. We will notify you of any adjustment as soon as practicable after release of the CPI-U for each second month prior to the month containing the anniversary date. Any increase shall become effective for all invoices issued on or after the anniversary date, and shall continue until the next anniversary date.

11.2.2. For example, if the CPI-U for the second month prior to the month containing the commencement date is 229.1, and the CPI-U for the second month prior to the month containing the anniversary date is 232.7, then the percentage increase in the CPI-U is 1.6%, the increase in the Case Fee is $0.01.

11.3. Our program is based on the Case Fee specified in the Schedule. Product pack changes will result in an adjustment in the Case Fee for the Product where the pack size changes. The Case Fee adjustment will be in proportion to the change in the case pack size.

11.3.1. For example, if the case for a Product changes from a 40 pound case to a 60 pound case, the Case Fee would be adjusted as follows: given a Case Fee of $2.38 in the Schedule, a change to a 60 pound case would result in a Case Fee for the Product of $3.57 [((60-40)/40 x $2.38) + $2.38 = $3.57].

11.4. **Average Cases Per Delivery Adjustment.** You and we acknowledge that your program is priced on a Case Fee basis and that failure to attain the Minimum Averages Cases Per Delivery listed in the Schedule adversely impacts the distribution economics of the program.

11.4.1. The Average Cases Per Delivery will be calculated for all Units on July 1, 2016 with any adjustment taking place with invoices dated August 1, 2016. The second review will take place on January 2, 2017 with any adjustments taking place with invoices dated February 1, 2017. Thereafter, reviews will take place every 6 months.

11.4.2. If the Average Cases per Delivery is outside of the neutral zone as shown in the Schedule, the Case Fee shall be adjusted as shown in the Schedule.

11.4.3. For example, if the Average Cases Per Delivery for the initial review period is 107 then the Case Fee is reduced by ($0.05). If the Average Cases Per Delivery was 92 the Case Fee would be increased by $0.05.

11.5. **Units Serviced Adjustment.** Should the number of Units serviced fall below 90 Units the Case Fee will be adjusted by the amount shown on the Schedule. The review period will follow the same review dates as the Average Cases Per Delivery Adjustment above.

11.6. **Extraordinary Circumstances.** The Pricing Mechanism will be adjusted for extraordinary costs and expenses associated with (1) delivery requirements different from those in place on the Date of this Agreement; (2) non-traditional delivery locations; (3) non-traditional delivery requirements of you or any Franchisee; or (4) changes in operating expenses associated with new governmental regulations, taxes, permits, laws, or other requirements. Such costs and expenses include compliance with governmental, municipal, and quasi-governmental requirements, including new taxes; special bonding of employees beyond the norm; wait time to complete deliveries unless the delay is caused by us (such as by way of example only, the driver not arriving during the scheduled delivery window); severe economic conditions adversely impacting the Continental United States, not reasonably foreseeable on the Date of this Agreement; deliveries to hard to access locations; use of any special equipment; and adherence to security requirements. The adjustment may be global impacting all Units or specific to an individual Unit, depending upon the circumstance.

12. **Proprietary Products.**

12.1. We will maintain an inventory of Proprietary Product items up to the number of items specified in the Schedule. Each separate SKU counts as a separate item.

12.2. **"Proprietary Products"** are Products that would not otherwise be brought into the inventory of a distribution center except for your requirements. Proprietary Products include Products with your label or logo, special order Products, test Products, menu special Products, seasonal Products, and Products requested by Units. Proprietary Products are determined by distribution center, and what is a Proprietary Product in one distribution center may or may not be a Proprietary Product in another distribution center. Proprietary Products include Products that have been purchased, transferred, or consigned for your account that we have in inventory, in transit, or for which non-cancelable orders have been placed.

12.3. You must notify DMA for us to stock Proprietary Products using the Product Information Form (PIF).

12.4. Notification to discontinue a Proprietary Product must be communicated to us in writing, which may include via e-mail.

12.5. If you specify a particular Supplier for your Proprietary Products which is not currently doing business with a Distributor, then the Supplier will be required to complete the Distributor's standard Supplier documentation before purchases can be made for resale to you. Supplier documentation includes agreements regarding indemnification, insurance coverage, requirements for disclosure of applicable hazardous materials (including for transportation), and applicable pure food guarantees. If the Supplier does not provide the documentation required by a Distributor and if you authorize us to proceed with the particular Supplier, then you indemnify the Distributor and its employees, officers and directors from all loss, damage, and expense (including reasonable attorneys' fees) for personal injury or property damage arising from or related to the delivery, sale, use or consumption of the Proprietary Products, or government imposed fines arising from inadequate notification of requirements with respect to hazardous materials, except to the extent caused by the Distributor's negligence or willful misconduct, or the negligence or willful misconduct of its employees or agents.

12.6. We will stock each Proprietary Product in sufficient quantities to meet our service requirements not to exceed a **3 weeks' average** supply of on-hand inventory. The on-hand inventory for some Proprietary Products may be lower to ensure freshness and shelf life of the Product.

12.7. The Units will purchase at least 7 cases of each Proprietary Product per week from each of our distribution centers, and we will notify you if the Units fail to do so. If movement for the Proprietary Product does not increase to the minimum within **30 days** of notice, the following options can be used for mitigation by you: (1) select an alternative Product commonly stocked by the distribution center; (2) procure the Proprietary Product as a direct shipment from the Supplier (freight and transfer fees may apply); or (3)

discontinue the Proprietary Product. If you do not choose one of these alternatives within **35 days** after our notice, then the Distributor shall discontinue the Product and implement option (1).

12.8. No Product substitutions for Proprietary Products will be made without the prior written approval of your authorized representative which written approval may be made via email). Any approved substitute Products will be sold at the Price calculated for the substitute Product as described in the section titled "Pricing", just like any other Product. If a substitute is due to Distributor error, the substitute will be priced at, or below, Proprietary Products' price for equivalent case pack.

12.9. If a Proprietary Product is discontinued by you, you must order (and may direct Franchisees to order) or pay for any remaining inventory of the Proprietary Product from all distribution centers within **45 days** after you notify us of discontinuance. If there are no sales of a Proprietary Product for **30 consecutive days** from a distribution center, you must order (and may direct Franchisees to order) or pay for any remaining inventory of the Proprietary Product from the distribution center within **45 days** after written notice (including by email) from us. The Products shall be purchased at the Price calculated as described in the section titled "Pricing". If Products are returned to the Suppliers, you will pay any re-stocking charges and freight incurred. If Products are sold to or picked up by a third party, you guarantee payment for such Products. If disposition of the Proprietary Products is not made within these time periods, we may, after requesting direction from you, dispose of or destroy them as necessary and, with provision of written proof of such disposition/destruction, invoice you for the Cost of the Products plus any fees associated with delabeling or disposal, if necessary. Products purchased under either the Cosi® label or products specifically manufactured for Cosi® will not be sold and/or disposed of by us without prior written agreement by you.

## 13. Proprietary Product Reduction Incentive.

13.1. We will reduce the Case Fee applicable to Units owned by you or any Franchisee based on a reduction in the number of Proprietary Products that we stock for you and the Franchisees as follows:

13.1.1.   We agree to reduce the Case Fee by $0.01, as shown in the Schedule, for each 20 case reduction in the number of Proprietary Products that we stock for you and the Franchisees in any distribution center ("**Proprietary Product Reduction Incentive**"), compared to the maximum number of cases of Proprietary Products stocked by a given distribution center as of the date of this Agreement ("**Reduction**"). The maximum number applicable to each distribution center will be provided to you by the applicable Distributor upon your request. The Proprietary Product Reduction Incentive will only be applicable to Units serviced by the distribution center in which the Proprietary Product Reduction occurred.

13.1.2.   The reduction in Case Fee, if any, will be implemented on the first day of the month following the month in which the Reduction of Proprietary Products occurred. If any distribution center stocks additional Proprietary Products following a previous Reduction, such that the Proprietary Product Reduction Incentive would no longer apply, then the reduction in Case Fee will be adjusted on the first day of the month following the month in which the increase in Proprietary Products occurred.

13.1.3.   For example, suppose that distribution center A experiences a Proprietary Product Reduction of 50 cases of Proprietary Products, and that distribution center B experiences a Proprietary Product Reduction of 15 cases of Proprietary Products, both as of January 15, 2016. Effective February 1, 2016, Units serviced by distribution center A would receive a Case Fee reduction of $0.02, but Units serviced by distribution center B would receive no reduction in Case Fee.

13.1.4.   In the same example above, suppose that, as of April 15, 2016, distribution center A increases the amount of Proprietary Products it stocks by 15, so that the net Reduction in Proprietary Products is 35, as compared to the maximum number of Proprietary Products applicable to that distribution center as of the date of this Agreement. Effective May 1, 2016, Units serviced by distribution center A would only receive a Case Fee reduction of $0.01.

## 14. Invoicing and Payment Terms.

14.1. Each Unit will be provided with an invoice at the time of delivery. The invoice will serve as the receiving document to aid the Unit's personnel to check in the shipment. Our driver will be empowered to adjust the invoice for shipping errors discovered at the time of delivery or for Product rejected at the time of delivery and returned to us.

14.2. The terms for payments must not exceed the number of days specified in the Schedule. Terms are measured from the date of our invoice to the date we receive payment. Payment terms for any Franchisee may be different than the payment terms specified in the Schedule, in the sole discretion of the Distributor servicing the Franchisee, and we or the Distributor shall communicate each Franchisee's payment terms to the Franchisee in writing if different from the payment terms specified in the Schedule.

14.3. The terms for payment specified in the Schedule are based on the creditworthiness of you and each Franchisee. Each Distributor has the right to change payment terms if, in the Distributor's sole judgment (1) the financial condition of you (or any Franchisee) materially deteriorates from that existing either on the date of the financial statements included in the Account Application originally submitted to the Distributor, or at any point during the Term of the Agreement, or (2) the Distributor becomes aware of circumstances that may materially and adversely impact your (or any Franchisee's) ability to meet financial obligations when due. The Distributor shall make the change in payment terms by written notice on you or the Franchisee: (1) describing the deterioration in financial condition or circumstances that materially and adversely impact ability to meet financial obligations with reasonable specificity; and (2) stating that the terms of payment shall be modified and made effective as specified in the notice. The modifications may include shortening payment terms, selling C.O.D., requiring a standby letter of credit issued by a bank to secure payment, a security deposit, a personal guarantee, or additional forms of security. The modifications shall be effective at the time specified in the notice, unless you or the Franchisee eliminate or cure the change in financial condition or inability to meet financial obligations before that time, to the Distributor's reasonable satisfaction.

14.4. We may reduce any amounts you or a Franchisee owes to us under this Agreement (including the purchase Price of Products) by any amounts we owe to you or the Franchisee. We may satisfy any amounts we owe to you or a Franchisee under this Agreement by applying them against amounts you or the Franchisee owes to us (including the purchase Price of Products). You and each Franchisee shall pay all of your or such Franchisee's invoices in full without setoff or deduction of any kind, except credits issued in the ordinary course of business and applied to the original invoice for which the credit is issued.

14.5. You and each Franchisee acknowledge that purchases made by you or the Franchisee may be made through electronic transactions. You and each Franchisee agree to the electronic storage of the signature given at the point of sale or time of delivery and agree to the later use of such signature on an itemized invoice or other document evidencing the same transaction. You and each Franchisee agree that the itemized invoice or other documents evidencing the same transaction, although presented in a different format than the document received at the point of sale or time of delivery, establishes the order and acceptance of Products from us.

14.6. **EFT Payment Pushed by Customer.** All payments made under this Agreement must be made by electronic funds transfer (EFT), unless agreed otherwise by you or the Franchisee and us.

14.6.1. Prior to submission of the first request for payment under this Agreement, the Distributor shall provide the information required to make payment by EFT to you (or the Franchisee). If the EFT information changes, the Distributor will provide the changed information to you (or the Franchisee).

14.6.2. For all EFT payments, the Distributor shall provide the following information: (1) the Distributor's name and remittance address as stated in the Agreement, (2) the Distributor's account number at the Distributor's financial agent, and (3) the signature (manual or electronic, as appropriate), title, and telephone number of the Distributor's official authorized to provide this information.

14.6.3. You (or any Franchisee) may make payment by EFT through an Automated Clearing House (ACH) subject to the banking laws of the United States or by other wire transfer system subject to the approval of the Distributor.

14.6.4. For ACH payment only, the Distributor will provide to you or the Franchisee the name, address, and 9-digit Routing Transit Number of the Distributor's financial agent, the Distributor's account number, and the type of account (checking, saving, or lockbox).

14.6.5. If an incomplete or erroneous transfer occurs because you (or any Franchisee) failed to use the Distributor-provided EFT information in the correct manner, then you (or the Franchisee) remain responsible for (1) making a correct payment, (2) paying any penalty or additional costs imposed for making a late payment, and (3) recovering any erroneously-directed funds.

15. **Key Performance Indicators and Other Critical Criteria.**

15.1. You and the Distributors have each stated that each can and will attain the respective Key Performance Indicators listed in the Schedule for performance by such party. The pricing and other terms of this Agreement are based on each party doing so. Each Key Performance Indicator will be calculated each calendar quarter as the average for all Units.

15.2. If either party fails to achieve one or more of the Key Performance Indicators for a calendar quarter, the other party will notify that party in writing of the need to review the deficiency and will recommend remedial action.

15.3. If the party fails to take the remedial action within **60 days** after service of notice, or if any of the party's Key Performance Indicators are not achieved in the **60 day** period, then the other party has the right to terminate the Term of this Agreement as provided in the section titled "Termination" on account of such failure.

16. **Price Audit.** You have the right to an on-site audit of each Distributor's Prices for all Products once per calendar year, as follows:

16.1. You must notify the Distributor to be audited at least **20 business days** in advance of the audit.

16.2. You have the right to check up to 25 line items per audit, and to check one pricing period per item.

16.3. The audit will be limited to Products purchased from the Distributor within the prior 90 days.

16.4. The audit will consist of reviewing computer reports documenting the Cost and the Distributor's calculation of the invoice Price. If requested and reasonably necessary for the audit, the Distributor will provide the Supplier's invoices and, where applicable, freight invoices. If any of the documents have been submitted electronically, the Distributor will furnish printouts of the electronic versions.

16.5. Supplier Contracted Products will be reviewed based on the contract Cost that you have negotiated with your Supplier.

16.6. The Distributor will provide adequate workspace and have its National Account Manager or Account Executive available for the audit.

16.7. You will not remove any of the Distributor's documents, or copies, provided for the audit from the Distributor's premises.

16.8. Reimbursement of overcharges and billing and payment for undercharges identified during the audit will be processed promptly but not more than 21 days after the date such overcharges or undercharges were identified.

16.9. If you request a third party to be present during the audit, the third party will sign a confidentiality agreement, in a form reasonably requested by the Distributor.

16.10.     You have made us aware that you are considering utilizing a third party for auditing and price verification purposes and may potentially select Buyers Edge for this purpose. DMA currently has a relationship with Buyer's edge and can comply with their requirements. Should you elect to utilize another third party for auditing and price verification services there may be additional costs associated with connecting with that third party's system. We will disclose those costs to you and you must pay these costs upfront before we integrate with that third party. So long as you utilize the services of Buyers Edge or any other approved third party to assist in price audits and price verification, DMA will not provide Price Verification, as described in Section 17, below.

17. **Price Verification.** We will provide Price verification for you through our e-Verify™ Price verification process, as follows:

17.1. Any Price being verified must be a Supplier Contracted Cost item (see Section 10 above).

17.2. You will provide us with your contract pricing utilizing the DMA form, as described in the section titled "Supplier Contracted Cost" (Section 10 above).

17.3. You recognize that accurate pricing is a shared responsibility, agree to participate in the process as required, and provide us with updated contract pricing by the 15th of each month.

17.4. Price Verification will be performed monthly and will consist of two types of price verification reports: (1) Expected Value Table ("EVT") comparison to order guides at the start of each month, and (2) EVT to invoice transaction comparison at the end of each month.

17.5. Reimbursement for the overcharges and billing and payment for the undercharges identified during the Price verification process will be processed promptly, but no later than **21 days** after the verification is completed.

18. **Credit and Collection.**

18.1. Your continuing creditworthiness is of central importance to us. In order for us to analyze and determine your creditworthiness and financial condition, you agree to furnish us with a completed account application using our forms (**"Account Application"**), your most recent audited financial statements, your most recent internal financial statements, and such other public documents as we reasonably request at any time during the Term of this Agreement. So long as you are a publicly traded company, you shall not be obligated to provide any financial statements or financial information not otherwise available to the general public, nor shall you be requested or required to complete more than one credit application per year. If at any time during the Term you are no longer a publicly traded company, then you will furnish private as well as public documents from time to time, but not more often than once in any calendar quarter. Each Franchisee, and any guarantor of any Franchisee, shall also provide the documents. Credit determinations will be made by each Distributor.

18.2. If this Agreement was signed prior to receiving completed Account Applications from you or a Franchisee, then: (1) the payment terms in the Schedule may be amended by DMA immediately upon notice to you or the Franchisee; and (2) this Agreement is not binding upon DMA or the Distributors, with respect to you or the Franchisee, if DMA notifies you or the Franchisee that any Account Application has

been rejected by one or more Distributors. Either of such notices must be served within **15 days** after each Distributor receives completed Account Applications from you or the Franchisee.

18.3. Any invoices not paid when due shall bear interest at the rate regularly charged on unpaid accounts by the Distributor issuing the invoice, but not in excess of the rate permitted by law.

18.4. If you fail to make a payment when due, we have the right to stop delivery of Products to you if the failure continues for 7 days after service of a notice from us. If any Franchisee fails to make a payment when due, we have the right to stop delivery of the Products immediately upon the failure, with or without notice.

18.5. As provided in the Uniform Commercial Code, if we have reasonable grounds, in our sole discretion, for insecurity as to your (or any Franchisee's) payment or performance (including the obligation to re-purchase Proprietary Products) and give notice specifying the grounds in reasonable detail, we may withhold delivery of Products until we receive adequate assurances of payment or performance, in such form as we reasonably request. You (or the Franchisee) will have at least 7 days after receipt of the notice to provide the adequate assurances before we cease deliveries.

18.6. If we have reason to believe, in our sole discretion, that you (or any Franchisee) are or are about to become insolvent, we have the right to take any action provided by law, and also the rights, with or without notice, to: (1) withhold delivery of Products; (2) stop delivery of Products in transit; (3) reclaim Products delivered to you (or the Franchisee) while insolvent, as permitted by law; (4) immediately change payment terms to C.O.D. by certified or bank check or wire transfer of immediately available funds, or (5) require a bank standby letter of credit as security.

18.7. If any proceedings are filed by or against you (or any Franchisee) in bankruptcy, or for appointment of a receiver or trustee, or if you (or any Franchisee) makes an assignment for the benefit of creditors, we have the right to stop deliveries immediately.

18.8. If you fail to pay within agreed upon terms, the unpaid amount of all of your outstanding invoices will, at the Distributor's option, immediately become due and payable irrespective of their payment terms and the Distributor may withhold all deliveries until the full amount due under such invoices is paid.

18.9. If any Franchisee fails to pay within agreed upon terms, the unpaid amount of all of the Franchisee's outstanding invoices will, at the Distributor's option, immediately become due and payable irrespective of their payment terms and the Distributor may withhold all deliveries to the Franchisee until the full amount due under such invoices is paid.

18.10.     You or any Franchisee will reimburse us upon demand for all costs and expenses, including reasonable attorneys' fees and court costs, incurred in collecting any amounts due to us. In any other action to enforce a party's rights under this Agreement, the non-prevailing party will reimburse the prevailing party upon demand for all costs and expenses, including reasonable attorneys' fees and court costs incurred by the prevailing party in any such action or proceeding.

18.11.     You (and each Franchisee) grant us a purchase money security interest in the Products to secure payments due from you (and each Franchisee) to us. You (and each Franchisee) authorize us to file a financing statement to evidence the security interest. We have all of the rights and duties of a secured party, and you (and each Franchisee) have all of the rights and duties of a debtor, under the Uniform Commercial Code.

18.12.     *PACA.* This section is a notice required under federal law. This Agreement may cover sales of perishable agricultural commodities as those terms are defined by federal law. All fresh and frozen fruits and vegetables which have not been processed beyond cutting, combining, or steam blanching are generally considered perishable agricultural commodities. All perishable agricultural commodities sold under this Agreement are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act of 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities and all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.

19. **Termination.**

19.1. You have the right to terminate the Term of this Agreement if any of the following occurs:

19.1.1.   DMA or the Distributors are in material breach of this Agreement, after the lapse of the cure period described in the section titled "General".

19.1.2.   DMA files a voluntary petition in bankruptcy, has filed against it an involuntary petition in bankruptcy that is not dismissed within **forty-five (45) days**, seeks or has appointed a trustee, receiver or custodian for the protection of its assets, admits in writing an inability to pay its bills, or files a petition or other action for liquidation, winding-up, dissolution, reorganization or the like.

19.1.3.   Either (1) the Distributors have failed to take the remedial action specified in a notice served upon the Distributors as required in the section titled "Key Performance Indicators and Other Critical Criteria", within **60 days** after service of the notice; (2) any of the Distributor Service Level Requirements to be performed by the Distributors are not achieved within **60 days** after service of

{00119451 3}                                           - 14 -

the written notice); or (3) both of the foregoing occur. In such case, you have the right to terminate by a second written notice served on DMA and the Distributors, which specifies an effective date of termination at least **30 days** after service of the second written notice.

19.1.4.   You serve a notice to terminate for convenience and without cause upon DMA, which specifies an effective date of termination at least **120 days** after service of the written notice.

19.2. DMA has the right to terminate the Term of this Agreement if any of the following occurs:

19.2.1.   You fail to make payments at the times required under this Agreement, and the failure continues for **15 days** after service of a written notice from DMA.

19.2.2.   You are in material breach (other than for failure to make payments) of this Agreement, after the lapse of the cure period described in the section titled "General".

19.2.3.   Either (1) you have failed to take the remedial action specified in a written notice served upon you as required in the section titled "Key Performance Indicators and Other Critical Criteria" within **60 days** after service of the written notice; (2) any of the Key Performance Indicators and Other Critical Criteria to be performed by you are not achieved within **60 days** after service of the written notice); or (3) both of the foregoing occur. In such case, DMA has the right to terminate by a second written notice served upon you, which specifies an effective date of termination at least **30 days** after service of the second written notice.

19.2.4.   Immediately upon written notice to you if, in DMA's sole judgment, (1) your financial condition materially deteriorates from that existing either on the date of the financial statements included in the Account Application originally submitted to the Distributors, or at any point during the Term of this Agreement, or (2) DMA becomes aware of circumstances that DMA believes in good faith may materially and adversely impact your ability to meet your financial obligations when due.

19.2.5.   DMA serves a written notice to terminate for convenience and without cause upon you, which specifies an effective date of termination at least 120 days after service of the notice.

19.3. DMA has the right to terminate any one or more Franchisees from food service distribution under this Agreement (and not you or any other Franchisees), if any of the following occurs:

19.3.1.   The Franchisee fails to make payments at the times required under this Agreement, and the failure continues for 15 days after service of a notice from DMA.

19.3.2.   The Franchisee is in material breach (other than for failure to make payments) of this Agreement, after the lapse of the cure period described in the section titled "General".

19.3.3.   Immediately upon written notice to the Franchisee if, in DMA's sole judgment, (1) its financial position materially deteriorates from that existing either on the date of the financial statements included in the Account Application originally submitted to the Distributors, or at any point during the Term of this Agreement, or (2) if DMA becomes aware of any circumstances that may materially and adversely impact such Franchisee's ability to meet its financial obligations when due.

19.3.4.   DMA serves a notice to terminate for convenience and without cause upon the Franchisee, which specifies an effective date of termination at least 120 days after service of the notice.

19.4. Upon termination of the Term of this Agreement, you will purchase any remaining inventory of the Proprietary Products from all of our distribution centers as follows.

19.4.1.   You will notify us within **5 days** after termination which Proprietary Products will be purchased F.O.B. our distribution centers, and which Proprietary Products are to be delivered to Customer (and Franchisees, if applicable), a successor distributor, or a third party.

19.4.2.   Any Proprietary Products purchased F.O.B. our distribution centers will be purchased at a price equal to the Cost of the Products.

19.4.3.   Any Proprietary Products delivered to Customer (and Franchisees, if applicable) or a third party will be purchased at the Price of the Products calculated as described in the section titled "Pricing".

19.4.4.   Customer (and Franchisees, if applicable) will purchase all perishable Proprietary Products within **7 days** after the effective date of termination and all frozen and dry Proprietary Products within **15 days** after the effective date of termination.

19.4.5.   Our invoices for the Proprietary Products will be paid for by Customer (and Franchisees, if applicable), the successor distributor, or the third party within **14 days** after the pick-up or delivery of the Products. Customer (and Franchisees, if applicable) guarantees payment for any Proprietary Products purchased by a successor distributor or a third party.

19.4.6.   If the Proprietary Products are not purchased within the time periods listed above, we have the right to dispose of such Products as necessary and you will pay the Price for the Products as stated above.

19.5. Upon termination, all invoices (except those for our remaining inventory of Proprietary Products) will be due and payable at the earlier of: (1) the date specified in the Schedule or applicable to a Franchisee under this Agreement (or as modified by any Distributor under this Agreement); or (2) the 7th day after the last day of shipment.

19.6. Termination of any Distributor from membership in DMA does not terminate the Term of or alter this Agreement, but DMA has the right to terminate the Distributor's obligation to furnish foodservice distribution to your Units on any date chosen by DMA, in DMA's sole discretion, after the effective date

of termination of membership. In such case, DMA will use commercially reasonable efforts to solicit the remaining Distributors, other DMA distributors not a party to this Agreement, or other distributors in the area to fulfill the terminated Distributor's service obligations to you. If DMA is unable to procure a distributor to fulfill the terminated Distributor's service obligations, then your sole remedy is to terminate the Term of this Agreement for convenience and without cause upon service of a notice upon DMA, which specifies an effective date of termination at least **120 days** after service of the notice.

20. **Warranties.**

    20.1. We assign to you all of our rights against the Suppliers of the Products under the warranties (if any) we receive from them, to the extent the rights are assignable. We will cooperate with you in the enforcement of any such warranties, so long as there is no additional cost to us. We reserve the rights to file a claim under and directly enforce any such warranties and indemnifications if any Distributor is named as a defendant or is otherwise liable under any suit or proceeding with regard to Products supplied by the Distributor. Distributors will use commercially reasonable efforts to cooperate with you to obtain indemnity and warranty agreements from each Supplier.

    20.2. **We do not make any warranties with respect to the Products via any document, oral, written, or electronic communication, or sample. We disclaim all warranties, express or implied, including any warranties of merchantability or fitness for a particular purpose, or arising as a result of custom or usage in the trade or by course of dealing with regard to the Products.**

21. **Indemnification and Claim Limitations.**

    21.1. You indemnify DMA and Distributors, their parent and affiliated companies, and the officers, directors, employees, and successors and assigns of the foregoing, from any third-party claim of loss, damage, or expense (including reasonable attorneys' fees), arising out of or related to: (1) any breach of a warranty or representation made by you under this Agreement; (2) any breach in the performance of obligations owed by you under this Agreement; (3) negligence in the performance of obligations owed by you under this Agreement (to the extent not caused by or contributed to by our negligence); (4) any negligent actions or omissions by you concerning or related to the Products after delivery by us in the storage, handling, or preparation of the Products, additions or modifications to the Products, or use of the Products; or (5) claims against DMA or Distributors by Franchisees or other third parties on account of adjustments to Pricing made at your direction or the payment of incentives, rebates, or commissions to you.

    21.2. Each Franchisee indemnifies DMA and Distributors, their parent and affiliated companies, and the officers, directors, employees, and successors and assigns of the foregoing, from any third-party claim of loss, damage, or expense (including reasonable attorneys' fees), arising out of or related to: (1) any breach of a warranty or representation made by the Franchisee under this Agreement; (2) any breach in the performance of obligations owed by the Franchisee under this Agreement; (3) negligence in the performance of obligations owed by the Franchisee under this Agreement (to the extent not caused by or contributed to by our negligence); (4) any negligent actions or omission by the Franchisee concerning or related to the Products after delivery by us in the storage, handling, or preparation of the Products, additions or modifications to the Products, or use of the Products; or (5) claims against DMA or Distributors by Customer or other third parties on account of adjustments to Pricing made at the Franchisee's direction or the payment of incentives, rebates, or commissions to the Franchisee.

    21.3. We indemnify you, your parent and affiliated companies, and the officers, directors, employees, and successors and assigns of the foregoing, from any third-party claim of loss, damage, or expense (including reasonable attorneys' fees), arising out of or related to: (1) any breach of a warranty or representation made by us under this Agreement; (2) any breach in the performance of our obligations under this Agreement; (3) our negligence in the performance of our obligations under this Agreement (to the extent not caused by or contributed to by your negligence); or (4) any negligent actions or omissions by us concerning or relating to the Products while they are in our possession, in the storage or handling of the Products.

    21.4. Neither DMA nor the Distributors are liable under this Agreement or otherwise for any loss, damage, or expense incurred by you which: (1) arises from or relates to a Product for which you designated the source or specifications, so long as neither DMA nor the Distributors caused or contributed to the loss, damage, or expense in the storage and handling of the Product; (2) are expressly disclaimed in this Agreement; (3) arises from or relates to the handling, preparation, or use of a Product before Distributor's receipt of the Product or after delivery; or (4) are partially or wholly caused by any breach in your or any Franchisee's performance of this Agreement, any breach of your or any Franchisee's warranties under this Agreement, or your negligence (or the negligence of any Franchisee).

    21.5. Our obligations upon our breach of, or for performance of, any provision of this Agreement, excluding: (1) indemnification for third-party claims, and (2) for breaches of the Section titled "Confidentiality", below, is limited, at our election, to the replacement of Products or crediting of an amount not to exceed the

purchase Price of the Products. We are only obligated to replace or credit the purchase Price for Products which our examination discloses to have been defective under ordinary and normal handling, preparation, use, and consumption. You or any Franchisee must give us notice of any breach at the affected Distributor's home office, within 30 days after you or the Franchisee discover the breach or should have discovered the breach using reasonable care, and if no such notice is given, you and the Franchisee waive the right to assert such matters.

21.6. **None of DMA, the Distributors, you, nor the Franchisees are liable to any other party hereunder for payment of any consequential, incidental, indirect, punitive, special or tort damages of any kind, including any loss of profits. The limitations on the liability of DMA, the Distributors, you, and the Franchisees contained in this Agreement apply regardless of whether the form of the claim against them is based on contract, negligence, strict liability, or tort law. The limitations set forth in this Section shall not apply to: (1) indemnification for third-party claims, or (2) claims relating to any breach of the Section titled "Confidentiality", below.**

21.7. The foregoing indemnification obligations and claim limitations shall survive the termination of the Term or expiration of this Agreement.

## 22. Confidentiality.

22.1. When we disclose Confidential Information (defined below) to you or any Franchisee, we are the Discloser, and you or the Franchisee are the Recipient. When you or any Franchisee disclose Confidential Information to us, you or the Franchisee are the Discloser, and we are the Recipient.

22.2. Recipient acknowledges that Discloser has a substantial economic investment in the Confidential Information, which Discloser has acquired at great cost over many years. Recipient is aware of Discloser's need to maintain the confidentiality of the Confidential Information. Therefore, in consideration for Discloser's revealing the Confidential Information, Recipient agrees to take reasonable actions to ensure that the Confidential Information remains confidential but not less than the degree of care Recipient takes to ensure the confidentiality of Recipient's Confidential Information.

22.3. Definition of Confidential Information.

22.3.1. "**Confidential Information**" means any information, data, or know-how concerning or related to Discloser's business or operations which is confidential, secret, or proprietary. Confidential Information includes that concerning or related to trade secrets, financial statements, finance, bank account information, marketing, customers, suppliers, costs, pricing (specifically including the pricing under this Agreement), manufacturing, software, business plans, personnel, sales, product specifications, recipes, expansion or closing plans for new or existing Units, engineering, research and development, and any other component or aspect of Discloser's business or operations. In particular, Confidential Information includes any information, data, or know-how concerning or related to price rebates, allowances, or discounts offered or received under this Agreement. Confidential Information includes both the information, data, and know-how itself, as well as its tangible expressions in writings, graphics, electronic media, models, prototypes, or other media. Confidential Information need not be so marked or stamped to qualify as Confidential Information. Confidential Information includes this Agreement.

22.3.2. Confidential Information excludes all of the following information, data, or know-how, so long as it was made available to Recipient by lawful means, without violation of any obligation of confidentiality: (1) information, data, or know-how in Recipient's possession prior to the commencement of the communications between Discloser and Recipient in contemplation of this Agreement; (2) information, data, or know-how which becomes generally available to the public other than by or through Recipient; and (3) information, data, or know-how made available to Recipient from other sources by lawful means.

22.3.3. Recipient may disclose Confidential Information if Recipient is required to do so by order of court or governmental agency, so long as Recipient first notifies Discloser sufficiently in advance to permit Discloser to seek a protective order relating to the disclosure. In such event, Recipient shall cooperate with Discloser in its efforts to seek a protective order or limit any such disclosure. If Discloser is unable to obtain a protective order, or if Discloser consents to the disclosure of such information, Recipient shall disclose only that information specifically required to be disclosed by such order of court or governmental agency.

22.4. Recipient will keep Confidential Information in confidence at all times in accordance with this Agreement. Recipient will not remove any Confidential Information from Discloser's premises, make any unauthorized copy of Confidential Information, or communicate any Confidential Information to any persons at any time in each case without Discloser's written consent (except to Recipient's management, accountants, credit consultants, or attorneys on a need-to-know basis, so long as each has agreed to or is bound under the same obligations of confidentiality as Recipient under this Agreement). Recipient will take all reasonable precautions to prevent inadvertent disclosure of Confidential Information. Recipient will use Confidential Information only as reasonably required to exercise its rights and perform its

obligations under this Agreement, and not in conducting or for the benefit of Recipient's other business or operations, or the business or operations of any other person or firm.

22.5. Upon request following termination of the Term of this Agreement, Recipient will return to Discloser or destroy all Confidential Information, including any papers, notes, electronic media, or other recorded material that contains any Confidential Information. Notwithstanding the foregoing in this Section 22.5, (a) Recipient may retain the Confidential Information in such manner and for such period of time as is required by applicable law, rule or regulation, court or regulatory authority; and (b) with respect to electronically backed-up files containing Confidential Information, Recipient may retain such files until they are destroyed in the ordinary course of business; and any such Confidential Information so retained shall, notwithstanding any termination of this Agreement, be kept confidential in accordance with the terms of this Agreement until it is redelivered to Discloser or destroyed.

22.6. Recipient's obligations under this Agreement to keep Confidential Information in confidence shall terminate on the 5th anniversary of the date the Term of this Agreement is terminated, except with respect to trade secrets of Discloser which at that time remain protected from disclosure by law. Recipient shall remain obligated to keep valid trade secrets in confidence at all times.

22.7. Recipient acknowledges that money damages shall be an inadequate remedy in the event of a breach of this section titled "Confidentiality" by Recipient and that such breach will cause Discloser irreparable injury and damage. Accordingly, Recipient agrees that Discloser shall be entitled to injunctive and other equitable relief in the event of a breach. Recipient waives any requirement for a bond or security in connection with such remedy.

22.8. Nothing herein shall restrict or prohibit Recipient from disclosing Confidential Information of Discloser to Recipient's accountants, attorneys, lenders and other professional advisors having a duty to maintain such information in confidence. Customer, as Recipient, may disclose Confidential Information of Discloser to its Franchisees, and DMA, as Recipient, may disclose Confidential Information to the Distributors. Additionally, if Recipient has a need to disclose any Confidential Information of Discloser to any other third party, such as purchasing consultants, technology providers, back office system providers, third-party logistics providers, or any other third party having a need to know such information, Recipient will cause such third party to sign a confidentiality agreement no less stringent than the terms of this Section 22 prior to any such disclosure. Recipient shall be liable for any unauthorized disclosure of Discloser's Confidential Information.

22.9. Recipient indemnifies Discloser, its parent and affiliated companies, and the officers, directors, employees, and successors and assigns of the foregoing, from any loss, damage, or expense (including reasonable attorneys' fees) arising out of or related to a breach of this section titled "Confidentiality" by Recipient if Discloser is the prevailing party in any such proceeding.

22.10.    Notwithstanding anything to the contrary contained herein, Customer may disclose in SEC filings those terms of this Agreement that Customer's outside Securities counsel determines to be necessary, and Customer may disclose in its Franchise Disclosure Document those terms of this Agreement that Customer's outside Franchise counsel determines to be necessary, and any such disclosures shall not be a violation of this Agreement.

23. **Distributor Liability.**

23.1. DMA warrants and represents to you that DMA is authorized to and does bind the Distributors to this Agreement by DMA's signature below.

23.2. Each Distributor will be severally liable for its respective service obligations and for Products sold to the Units which it services. Notwithstanding anything to the contrary in this Agreement, no Distributor is liable for service obligations or Products sold to Units which it does not service. Each Distributor is responsible for its own credit determination and for collection of its invoices. This Agreement shall not create joint liability or joint and several liability among Distributors, or among Distributors and DMA. No Distributor is the agent for, or authorized to obligate, any other Distributor. The Distributors are independent contractors and not partners or joint venturers with each other or with you. DMA is only liable for obligations which it specifically agrees to undertake in this Agreement.

23.3. You and the Franchisees are obligated for payment of purchases of Products solely to the Distributor which has delivered the Products to you or the Franchisee.

24. **Insurance.** At all times during the Term of this Agreement, each Distributor shall procure and maintain at its own expense commercial insurance of the types and in the amounts reasonable for the nature of the business and the services provided hereunder and consistent with best practices in the industry, including no less than the following:

(a) General Liability insurance coverage and, if necessary, commercial umbrella insurance coverage, each written on an occurrence form, with policy limits of not less than $3,000,000 per occurrence, containing a waiver of subrogation in favor of you and your affiliates and subsidiaries, and your and their respective officers,

directors, shareholders, members, managers, employees, agents, successors and assigns ("**Additional Insureds**"). You and the other Additional Insureds will be included as an additional insured under the policies. These limits must cover bodily injury and property damage and apply on an occurrence basis. Any aggregate limit must apply per job and must be unimpaired. Premises/operations, independent contractors, products/completed operations, personal injury, and contractual liability coverage must be included, and Broad Form Property Damage endorsement (including contractual liability) must be covered. Policy must include severability of interest clause for all additional insureds with no cross liability suits exclusion. The Policy must name Cosi, Inc. and the other Cosi Additional Insureds as additional insureds as their interest appears on a primary and non-contributory basis;

(b) Comprehensive Automobile Liability in the minimum amount of $2,000,000 per occurrence combined single limit, including owned, hired, leased and non-owned vehicles, with a waiver of subrogation in favor of you and the other Additional Insureds;

(c) Workers' Compensation in the minimum amount of the statutory limits required by law, in all states where the services are performed for you; and, Employer's Liability in the minimum amount of the greater of $1,000,000 for injury by accident and $1,000,000 for injury by disease, or the minimum amount required by law, with a waiver of subrogation in favor of you and the other Additional Insureds. The Employer's Liability limit may be combined with either an excess or umbrella liability policy;

(d) Fidelity Insurance in an amount not less than $500,000;

All such policies shall name the Additional Insureds and waivers of subrogation. We will provide to you certificates evidencing our insurance coverage at the time we execute this Agreement but in no event more than five (5) days thereafter. We will provide for not less than thirty (30) days' prior written notice, of any cancellation, termination, expiration, non-renewal or material change of the insurance coverage represented by such certificate. All insurance required hereby shall be provided by an insurance company or companies having a rating of A-/X or better as rated by Best's Insurance Reports published by A.M. Best Company, Inc. and licensed to do business in the states in which the services are to be provided to the Company. The purchase of such insurance and the furnishing of such certificates shall not limit our obligations under the agreement.

25. **Recalls, Holds, Inspections, and Product Withdrawals.**

  25.1. If a governmental authority declares that any of the Products or any ingredient, packaging, or supplies used in connection with the Products, or if we at any time believe in good faith that any of the Products or any such ingredient, packaging, or supplies, (1) is or may be adulterated or misbranded or does not or may not conform with an applicable consumer or regulatory product safety standard, or (2) is or may be otherwise unsafe or unfit for the intended use of the Product, then, without limiting other rights and remedies that are available to us under this Agreement or applicable law, we shall have the right to recall or withdraw all such Products from you, and cancel or not ship orders based on a recall, withdrawal, alert, or good faith decision.

  25.2. If any governmental authority issues an alert or warning on a Product, and you or any Franchisee requests shipment of the Product notwithstanding the notification of the alert or warning from DMA or the Distributor, you or such Franchisee indemnify the Distributor and DMA from any loss, damage, or expense (including reasonable attorney's fees) from actions, disputes, claims, or controversies of any kind arising out of or in any way related to the requested shipment.

  25.3. To the extent that we request, you or such Franchisee agree to comply with appropriate disposition instructions with respect to all such Products, packaging, or supplies that we have previously delivered to you and to reasonably assist us in all aspects of a recall, including (1) developing a recall strategy and preparing and furnishing reports, records, and other information with respect to such recall, and (2) notifying any of your customers or consignees who may be in possession of the recalled Products.

  25.4. If, in the absence of a formal recall or withdrawal of Product initiated by the Supplier of such Product, or a government authority, you direct us to withdraw all such Products from our distribution centers, we reserve the right to assess a reasonable handling charge.

  25.5. Each Distributor has a stated recall policy to charge each Supplier for expenses the Distributor incurs as a result of recalls and withdrawals of Products purchased from the Supplier. If the Distributor purchases Proprietary Products exclusively for you or any Franchisee, and if the Supplier does not pay such expenses, you or such Franchisee agree to pay or reimburse the Distributor for all such expenses.

  25.6. You and each Franchisee will notify us, within **48 hours** after you or the Franchisee have knowledge of its occurrence, of any illness, sickness, accident, or malfunction involving any Products which results in injury to or death of persons, or damage to property, or the loss of its use. You and each Franchisee will cooperate fully with us in investigating and determining the cause of any such event.

26. **Force Majeure.** No party to this Agreement is liable for any loss, damage, or expense from any delay in delivery or failure of performance due to any cause beyond the party's control, including fire or other casualty;

strike or labor difficulty; accident; war conditions; riot or civil commotion; terrorism; government regulation or restriction; shortages in transportation, power, labor or material; unforeseeable abnormal road or traffic conditions; freight embargo; default of supplier; or events which render performance commercially impracticable or impossible. This section does not relieve a party from any obligation to pay money or issue credits.

27. **Contract Interpretation.**

27.1. You and we acknowledge that your home office, the Units, DMA's home office, our Distributors, and our distribution centers are situated in many different States. To simplify interpretation of this Agreement, the Uniform Commercial Code (most recent version adopted by the Uniform Laws Commission) is incorporated by reference into this Agreement, and for any remaining matters not determined by such Code, including instances in which a Uniform Commercial Code provision requires interpretation or provides alternate rules to be selected by the States, Delaware law (without reference to its choice of law rules) shall apply.

27.2. The terms of this Agreement shall govern over any other conflicting, different, or additional terms in your purchase order, acceptance, or other form. We object to such terms, and they are not binding on us. If you or any Franchisee use such a form, the form shall be used for convenience only, and shall evidence your unconditional agreement to the terms of this Agreement.

27.3. The examples given in this Agreement are for illustrative purposes only and are not necessarily indicative of actual or predicted results.

28. **General.**

28.1. No party is in breach of this Agreement unless the non-breaching party has given written notice to the breaching party describing the breach in reasonable detail, and the breaching party has failed to cure the breach within 30 days after service of the written notice (or if the breach cannot reasonably be cured within that period, the breaching party has failed to diligently begin to cure the breach within that period). This sub-section shall not apply to breaches consisting of the obligation to pay money or issue credits.

28.2. A failure to make payment to or other breach committed against a Distributor or DMA shall be considered a failure to make payment to or other breach committed against all Distributors and DMA.

28.3. The parties agree to use commercially reasonable efforts to resolve any disputes related to the performance of this Agreement. If the parties cannot reach an equitable resolution, any action or suit against DMA or any Distributors, on the one hand, and Customer or any Franchisees, on the other hand, in any way arising from or related to this Agreement or the Products must be commenced within one year after the cause of action has accrued, and may be filed in the state or federal courts located within the **State of Illinois** or **State of Delaware**, applying the law of the **State of Delaware** without regard to choice of law provisions. DMA, Distributors, Customer, and Franchisees each consents to non-exclusive jurisdiction and venue in such courts. In any action or proceeding to enforce the terms of this Agreement, the prevailing party shall be entitled to reimbursement for all costs and expenses, including, without limitation, reasonable attorneys' fees and costs, incurred or suffered by such party in connection with any such action or proceeding.

28.4. The words "including" and "includes" as used in this Agreement mean "including, without limitation" or "includes, without limitation", respectively.

28.5. Our obligations under this Agreement are extended to you only, and shall not inure to the benefit of or form the basis of a claim by any purchaser of the Products or other party. Neither you nor DMA will assign or otherwise transfer this Agreement without the other's prior written consent, which shall not be unreasonably withheld, delayed, or conditioned. Notwithstanding the foregoing in this paragraph, this Agreement may be assigned by you at any time to any corporation or entity that controls or is controlled by or is under common control with you, in which event you shall jointly liable for your obligations under this Agreement, or to a successor or new owner in a merger or sale of your business or sale of all or substantially all of your assets, by written notice to DMA, provided that such assignee or transferee agrees in writing to assume all of your obligations under this Agreement, and further provided that we may re-evaluate your credit terms based upon the creditworthiness of such transferee or assignee

28.6. All previous oral, written, or electronic communications between you, any Franchisee, DMA, and any Distributors for the sale of the Products to the Units are superseded by this Agreement. This Agreement, together with its Schedule and Exhibits, the Acceptance, and the Account Application constitute the final, complete, and exclusive expression of the agreement between you, the Franchisees, DMA, and the Distributors for the sale of the Products to the Units. This Agreement may be amended only with the prior written consent of you and DMA, except as stated otherwise.

28.7. The remedies provided in this Agreement are cumulative. The exercise of any right or remedy under this Agreement shall be without prejudice to the right to exercise any other right or remedy in this Agreement, by law, or in equity.

28.8. The invalidity of any part of this Agreement shall not invalidate any other part and, except for the invalid part, the rest of this Agreement shall remain effective. No waiver of performance shall be valid without consent of the party entitled to the performance. No waiver of a specific action shall be construed as a waiver of future performance.

28.9. Each party waives its right to jury trial with respect to any disputes, claims, or controversies of any kind whatsoever under this Agreement.

28.10.       Any notice, consent, demand, or other submission required under this Agreement shall be in writing and delivered to Customer, DMA and Distributors at the addresses set forth in the Schedule, or at any addresses they designate for notices hereunder. For any Franchisees, any notice, consent, demand, or other submission shall be delivered to the Franchisee's corporate office stated in the Acceptance or, if no corporate office address is specified, to the delivery address for the Unit, specified on the attached Exhibit. Notice may be made by hand delivery, by recognized overnight courier, by first class mail (registered or certified, return receipt requested), or by email, in each case prepaid. Service by email must be acknowledged by a return email from the recipient, or confirmed in writing using another of the foregoing methods. All such communications shall be effective (a) upon delivery (or attempted delivery if rejected) if made by hand delivered, (b) the next business day after sent if made by recognized overnight courier, (c) three (3) business days after the date sent (as evidenced by the date of the postmark) if made by first class mail (registered or certified, return receipt requested), (d) when acknowledged by a return email or "read receipt" confirmation, provided that a copy of such notice is also sent by one of the other methods hereunder within three (3) business days.

Distribution Market Advantage, Inc.

Signature

By Daniel J. Cox

Its President and CEO

Date: 3 | 11 | 16

Cosi, Inc.

Signature

By Miguel Rossy-Donovan

Its CFO

Date: 3 / 10 / 16

Units under Cosi, Inc. Foodservice Distribution Agreement

| Chain Concept Name | Dist Whs Name | Ownership | Dist Cust Nbr | Unit Nbr | Unit Address | Unit City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|
| COSI | GFS-POT | CORPORATE | 100031969 | 22 | 970  FARMINGTON AVE | W. HARTFORD | CT | 06107 |
| COSI | GFS-POT | CORPORATE | 100032003 | 94 | 385 WEST MAIN STREET | AVON | CT | 06001 |
| COSI | GFS-POT | CORPORATE | 100032013 | 145 | 1209 HIGH RIDGE ROAD | STAMFORD | CT | 06905 |
| COSI | GFS-POT | CORPORATE | 100032014 | 146 | 129 WEST PUTNAM AVE | GREENWICH | CT | 06830 |
| COSI | GFS-POT | CORPORATE | 100032027 | 170 | 230 TRESSER BLVD | STAMFORD | CT | 06901 |
| COSI | GFS-POT | CAPITAL C RESTAURANTS LLC | 100033482 | 636 | 1300 36TH STREET NW | WASHINGTON | DC | 20057 |
| COSI | GFS-POT | CAPITAL C RESTAURANTS LLC | 100039238 | 670 | 2401 S. SMITH BLVD | WASHINGTON | DC | 22202 |
| COSI | GFS-POT | CAPITAL C RESTAURANTS LLC | 100045895 | 673 | 1350 CONNECTICUT AVE | WASHINGTON | DC | 20036 |
| COSI | GFS-POT | CAPITAL C RESTAURANTS LLC | 100045898 | 676 | 1700 PENNSYLVANIA AVE | WASHINGTON | DC | 20006 |
| COSI | GFS-POT | CAPITAL C RESTAURANTS LLC | 100045899 | 677 | 700 11TH STREET NW | WASHINGTON | DC | 20001 |
| COSI | GFS-POT | CAPITAL C RESTAURANTS LLC | 100045901 | 679 | 1001 PENNSYLVANIA AVE. NW | WASHINGTON | DC | 20004 |
| COSI | GFS-POT | CAPITAL C RESTAURANTS LLC | 100045903 | 681 | 1501 K STREET, NW | WASHINGTON | DC | 20005 |
| COSI | GFS-POT | CAPITAL C RESTAURANTS LLC | 100045904 | 682 | 601 PENN AVE. NW | WASHINGTON | DC | 20004 |
| COSI | GFS-POT | CAPITAL C RESTAURANTS LLC | 100045906 | 684 | 1333 H ST, NW | WASHINGTON | DC | 20005 |
| COSI | GFS-POT | CAPITAL C RESTAURANTS LLC | 100045907 | 685 | 5252 WISCONSIN AVE, NW | WASHINGTON | DC | 20015 |
| COSI | GFS-POT | FRANCHISEE | 100114521 | 711 | 2702 MARTIN LUTHER KING JR AVE | WASHINGTON | DC | 20032 |
| COSI | GFS-POT | CORPORATE | 100130263 | 217 | 111 EAST MAIN STREET | NEWARK | DE | 19711 |
| COSI | GFS-POT | -- | 100122290 | 633 | 119 S WEST ST | WILMINGTON | DE | 19801 |
| COSI | GFS-KEN | CORPORATE | 870950003 | 49 | 116 S. MICHIGAN AVE. | CHICAGO | IL | 60603 |
| COSI | GFS-KEN | CORPORATE | 870950005 | 54 | 230 W. WASHINGTON STR. | CHICAGO | IL | 60606 |
| COSI | GFS-KEN | CORPORATE | 870950007 | 62 | 203 N. LASALLE STREET | CHICAGO | IL | 60601 |
| COSI | GFS-KEN | CORPORATE | 870950008 | 68 | 230 MONROE ST. | CHICAGO | IL | 60606 |
| COSI | GFS-KEN | CORPORATE | 870950011 | 105 | 233 N. MICHIGAN AVE. | CHICAGO | IL | 60601 |
| COSI | GFS-KEN | CORPORATE | 870950013 | 141 | 1740 SHERMAN AVE. | EVANSTON | IL | 60201 |
| COSI | GFS-KEN | CORPORATE | 870950014 | 143 | 33 N. DEARBORN | CHICAGO | IL | 60602 |
| COSI | GFS-KEN | CORPORATE | 870950035 | 158 | 910 NORTH MILWAUKEE AVENUE, SUITE A | LINCOLNSHIRE | IL | 60069 |
| COSI | GFS-KEN | CORPORATE | 100038763 | 177 | 2100 PATRIOT BLVD | GLENVIEW | IL | 60026 |
| COSI | GFS-KEN | CORPORATE | 100119678 | 201 | 259 E ERIE ST | CHICAGO | IL | 60611 |
| COSI | GFS-SPR | LLC | 100005276 | 602 | 1890 STAR SHOOT PARKWAY, STE. 195 | LEXINGTON | KY | 40509 |
| COSI | GFS-SPR | LLC | 100016096 | 640 | 410 WEST VINE STREET | LEXINGTON | KY | 40507 |
| COSI | GFS-POT | CORPORATE | 100033303 | 202 | 133 FEDERAL STREET | BOSTON | MA | 02210 |
| COSI | GFS-POT | CORPORATE | 100033304 | 203 | 53 STATE STREET | BOSTON | MA | 02110 |
| COSI | GFS-POT | CORPORATE | 100033305 | 204 | 14 MILK STREET | BOSTON | MA | 02108 |
| COSI | GFS-POT | CORPORATE | 100033307 | 205 | 2 SOUTH STATION STREET, SUITE 182 | BOSTON | MA | 02110 |
| COSI | GFS-POT | CORPORATE | 100033309 | 207 | A | EAST BOSTON | MA | 02128 |
| COSI | GFS-POT | CORPORATE | 100033310 | 208 | 290 MAIN STREET | CAMBRIDGE | MA | 02142 |
| COSI | GFS-POT | CORPORATE | 100033311 | 209 | 280 SCHOOL STREET SUITE D135 | MANSFIELD | MA | 02048 |
| COSI | GFS-POT | CORPORATE | 100033312 | 210 | 125 HIGH STREET | BOSTON | MA | 02110 |
| COSI | GFS-POT | CORPORATE | 100033314 | 211 | 2421 CRANBERRY HWY SUITE 336 | WAREHAM | MA | 02538 |
| COSI | GFS-POT | CORPORATE | 100109263 | 214 | 2 SEAPORT LANE | BOSTON | MA | 02210 |
| COSI | GFS-POT | CORPORATE | 100116922 | 215 | 399 BOYLSTON ST | BOSTON | MA | 02116 |
| COSI | GFS-POT | HEARTHSTONE PARTNERS LLC | 100075479 | 686 | 200 TERMINAL B | BOSTON | MA | 02128 |
| COSI | GFS-POT | CORPORATE | 100031992 | 58 | 7251 WOODMONT AVENUE | BETHESDA | MD | 20814 |
| COSI | GFS-POT | CORPORATE | 100032022 | 156 | 9177 REISTERSTOWN ROAD | OWINGS MILLS | MD | 21117 |
| COSI | GFS-POT | CORPORATE | 100032023 | 157 | 100 SOUTH CHARLES | BALTIMORE | MD | 21201 |
| COSI | GFS-POT | CORPORATE | 100136297 | 219 | 6181 OLD DUBBIN LANE | COLUMBIA | MD | 21045 |
| COSI | GFS-BRJ | CORPORATE | 870950017 | 66 | 101 N. OLD WOODWARD AVE. | BIRMINGHAM | MI | 48009 |
| COSI | GFS-BRJ | CORPORATE | 870950018 | 82 | 301 E. GRAND RIVER AVE. | EAST LANSING | MI | 48823 |
| COSI | GFS-BRJ | CORPORATE | 870950020 | 88 | 37652 TWELVE MILE ROAD | HILLS | MI | 48331 |
| COSI | GFS-BRJ | CORPORATE | 870950021 | 97 | 28674 TELEGRAPH RD. | SOUTHFIELD | MI | 48034 |
| COSI | GFS-KEN | CORPORATE | 100033642 | 176 | 710 MARQUETTE AVENUE, IDS SUITE 150 | MINNEAPOLIS | MN | 55402 |
| COSI | GFS-POT | CORPORATE | 100031995 | 67 | 29 WASHINGTON ST | MORRISTOWN | NJ | 07960 |
| COSI | GFS-POT | CORPORATE | 100130279 | 216 | 4301 DEARBORN CIRCLE | MT. LAUREL | NJ | 08054 |
| COSI | GFS-POT | CORPORATE | 100133602 | 218 | 360 ESSEX ST SPACE | HACKENSACK | NJ | 07601 |
| COSI | GFS-POT | LLC | 100033455 | 610 | 535 WASHINGTON BOULEVARD | JERSEY CITY | NJ | 07310 |
| COSI | GFS-POT | LLC | 100040949 | 635 | 700 PLAZA DRIVE SPACE 12 | SECAUCUS | NJ | 07094 |
| COSI | GFS-POT | LLC | 100033457 | 642 | 30 HUDSON STREET | JERSEY CITY | NJ | 07302 |

## Units under Cosi, Inc. Foodservice Distribution Agreement

| Chain Concept Name | Dist Whs Name | Ownership | Dist Cust Nbr | Unit Nbr | Unit Address | Unit City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|
| COSI | GFS-POT | CORPORATE | 100031972 | 24 | 38 E. 45TH ST | NEW YORK | NY | 10017 |
| COSI | GFS-POT | CORPORATE | 100031974 | 26 | 60 EAST 56 ST | NEW YORK | NY | 10022 |
| COSI | GFS-POT | CORPORATE | 100031976 | 28 | 55 BROAD ST | NEW YORK | NY | 10004 |
| COSI | GFS-POT | CORPORATE | 100031978 | 31 | 61 WEST 48 ST | NEW YORK | NY | 10020 |
| COSI | GFS-POT | CORPORATE | 100031979 | 37 | 685 THIRD AVE | NEW YORK | NY | 10017 |
| COSI | GFS-POT | CORPORATE | 100031982 | 41 | 461 PARK AVE SOUTH | NEW YORK | NY | 10016 |
| COSI | GFS-POT | CORPORATE | 100031996 | 75 | 1298 BOSTON POST ROAD | LARCHMONT | NY | 10538 |
| COSI | GFS-POT | CORPORATE | 100031998 | 77 | 77 QUAKER RIDGE ROAD | NEW ROCHELLE | NY | 10804 |
| COSI | GFS-POT | CORPORATE | 100032008 | 106 | 498 SEVENTH AVE | NEW YORK | NY | 10018 |
| COSI | GFS-POT | CORPORATE | 100032009 | 107 | 700 SIXTH AVE. | NEW YORK | NY | 10010 |
| COSI | GFS-POT | CORPORATE | 100032017 | 150 | 441 S OYSTER BAY ROAD | PLAINVIEW | NY | 11803 |
| COSI | GFS-POT | CORPORATE | 100032028 | 171 | 53 EAST 8TH STREET | NEW YORK | NY | 10003 |
| COSI | GFS-POT | SODEXHO | 100101396 | 690 | 441 EAST FORDHAM ROAD | BRONX | NY | 10458 |
| COSI | GFS-SPR | CORPORATE | 870950024 | 89 | 7166 N. HIGH STR | WORTHINGTON | OH | 43085 |
| COSI | GFS-SPR | CORPORATE | 870950026 | 95 | 6390 SAWMILL RD | COLUMBUS | OH | 43235 |
| COSI | GFS-SPR | CORPORATE | 870950027 | 100 | 2212 E. MAIN ST. | BEXLEY | OH | 43209 |
| COSI | GFS-SPR | CORPORATE | 870950022 | 200 | 4077 FENLON STREET | COLUMBUS | OH | 43219 |
| COSI | GFS-POT | CORPORATE | 100031956 | 3 | 235 SOUTH 15TH STREET | PHILADELPHIA | PA | 19102 |
| COSI | GFS-POT | CORPORATE | 100031958 | 4 | 325 CHESTNUT ST | PHILADELPHIA | PA | 19106 |
| COSI | GFS-POT | CORPORATE | 100031960 | 7 | 112B WALNUT ST | PHILADELPHIA | PA | 19107 |
| COSI | GFS-POT | CORPORATE | 100031963 | 10 | 140 SOUTH 36TH STREET | PHILADELPHIA | PA | 19104 |
| COSI | GFS-POT | CORPORATE | 100031964 | 11 | 761 LANCASTER AVE. | BRYN MAWR | PA | 19010 |
| COSI | GFS-POT | CORPORATE | 100031981 | 40 | 1700 MARKET STREET | PHILADELPHIA | PA | 19103 |
| COSI | GFS-POT | CORPORATE | 100032002 | 93 | 295 MAIN STREET | EXTON | PA | 19341 |
| COSI | GFS-POT | CORPORATE | 100032012 | 144 | 50 YORKTOWN PLAZA | ELKINS PARK | PA | 19027 |
| COSI | GFS-POT | CORPORATE | 100032024 | 160 | 424 W SWEDESFORD ROAD | BERWYN | PA | 19312 |
| COSI | GFS-POT | CORPORATE | 100032029 | 173 | 2955 MARKET STREET | PHILADELPHIA | PA | 19104 |
| COSI | GFS-POT | CORPORATE | 100106443 | 178 | 2880 CENTER PKWY | CENTER VALLEY | PA | 18034 |
| COSI | GFS-POT | CORPORATE | 100106444 | 179 | 104 PHEASANT RUN | NEWTON | PA | 18940 |
| COSI | GFS-POT | ANTHONY D. PALAGANO | 100033394 | 645 | 200 TOWN CENTER DRIVE SUITE 108 | GLEN MILLS | PA | 19342 |
| COSI | GFS-POT | SODEXHO | 100101394 | 691 | 1801 NORTH BROAD ST | PHILADELPHIA | PA | 19122 |
| COSI | BEK-SAN | LLC | 305187 | 639 | 17503 LA CANTERA PARKWAY | SAN ANTONIO | TX | 78251 |
| COSI | GFS-POT | -- | 100120277 | -- | 200 STADIUM DRIVE | WILLIAMSBURG | VA | 23186 |
| COSI | GFS-POT | CORPORATE | 100031966 | 19 | 2050 WILSON BLVD | ARLINGTON | VA | 22207 |
| COSI | GFS-POT | CORPORATE | 100031986 | 46 | 4250 FAIRFAX DRIVE | ARLINGTON | VA | 22203 |
| COSI | GFS-POT | CORPORATE | 100031994 | 63 | 11909 DEMOCRACY DRIVE | RESTON | VA | 20190 |
| COSI | GFS-POT | CORPORATE | 100032015 | 147 | 1801 N. LYNN STREET | ARLINGTON | VA | 22209 |
| COSI | GFS-POT | CORPORATE | 100032026 | 164 | 3503 FAIRFAX DRIVE, SUITE 200 | ARLINGTON | VA | 22226 |
| COSI | GFS-POT | CORPORATE | 100032031 | 175 | 2011 CRYSTAL DRIVE SUITE 100 | ARLINGTON | VA | 22202 |
| COSI | GFS-POT | HOJEIJ BRAND FOODS | 100039888 | 671 | DULLES INT'L AIRPORT TERMINAL A | STERLING | VA | 20166 |
| COSI | GFS-KEN | CORPORATE | 870950028 | 79 | 8775 N. PORT WASHINGTON RD. | FOX POINT | WI | 53217 |
| COSI | GFS-KEN | CORPORATE | 870950033 | 166 | 8310 GREENWAY BLVD | MIDDLETON | WI | 53562 |

### Acceptance of Foodservice Distribution
### Agreement by Franchisee

**Franchisee:** _____

_____

_____

**DMA:** Distribution Market Advantage, Inc., 1515 Woodfield Rd., Schaumburg, IL 60173. Email: dan.cox@dmadelivers.com.

**Distributors:** Ben E. Keith Company, 7600 Will Rogers Blvd, Ft. Worth, TX 76140. Email: cslewis@benekeith.com.

Gordon Food Service, Inc., 1300 Gezon Parkway SW, Wyoming, MI 49509. Email: brian.larsen@gfs.com.

**Customer:** Così, Inc., 294 Washington St, Suite 510, Boston, MA 02108, Email: rj@getcosi.com.

**Foodservice Distribution Agreement:** Foodservice Distribution Agreement with the Term beginning on March 1, 2016 between DMA, Distributors, and Customer.

Franchisee agrees as follows:

1. **Acknowledgements.** Franchisee acknowledges as follows:

   1.1. Franchisee and Customer have entered into an agreement (the "Franchise Agreement") governing the terms under which Franchisee will operate one or more retail food establishments under the trade name of Customer and under which Franchisee will purchase products.

   1.2. DMA and Distributors have entered into the Foodservice Distribution Agreement with Customer in order to provide a portion of the purchasing, warehousing, and distribution functions for Customer's concept and franchise system on terms negotiated by Customer. DMA and Distributors require this Acceptance in order to furnish those functions to Franchisee.

2. **Acceptance.** In order for Franchisee to have the benefit of the terms and conditions of the Foodservice Distribution Agreement, (1) Franchisee accepts the terms and conditions of the Foodservice Distribution Agreement applicable to Franchisees, (2) Franchisee's purchase of Products under the Foodservice Distribution Agreement shall be governed by the Foodservice Distribution Agreement, and (3) Franchisee shall be obligated to perform all of the obligations required of Franchisee under the Foodservice Distribution Agreement. The terms of the Foodservice Distribution Agreement are incorporated into this Acceptance by this reference. Customer has agreed to furnish Franchisee at any time upon request of Franchisee with either: (1) a copy of the Foodservice Distribution Agreement; (2) a copy of the Foodservice Distribution Agreement redacted to remove confidential information; or (3) a summary of the Foodservice Distribution Agreement which lists all applicable rights and obligations pertaining to Franchisee.

3. **Amendments.** Franchisee acknowledges that the Foodservice Distribution Agreement may be amended, from time to time, with the consent of Customer, DMA, and Distributors. Any such amendments shall be binding on Franchisee.

Franchisee:

_____

By _____

Its _____

Date: _____

### Third Party Confidentiality Agreement

| | |
|---|---|
| **Third Party:** | _____<br><br>_____<br><br>_____ |
| **DMA:** | Distribution Market Advantage, Inc., 1515 Woodfield Rd., Schaumburg, IL 60173. Email: dan.cox@dmadelivers.com. |
| **Distributors:** | Ben E. Keith Company, 7600 Will Rogers Blvd, Ft. Worth, TX 76140.  Email: cslewis@benekeith.com.<br><br>Gordon Food Service, Inc., 1300 Gezon Parkway SW, Wyoming, MI 49509.  Email: brian.larsen@gfs.com. |
| **Customer:** | Cosi, Inc., 294 Washington St, Suite 510, Boston, MA 02108, Email: rj@getcosi.com. |
| **Agreement:** | Foodservice Distribution Agreement with the Term beginning on March 1, 2016 between DMA, Distributors, and Customer. |
| **Confidential Information:** | "Confidential Information", as defined under the section titled "Confidentiality" of the Agreement |

Third party agrees as follows:

1. **Acknowledgements.**  Third Party, DMA, Distributors, and Customer acknowledge as follows:

   1.1. Customer has retained Third Party to provide services to Customer in connection with the Agreement.

   1.2. DMA and Distributors have disclosed Confidential Information to Third Party to permit Third Party to perform its services to Customer.

2. **Acceptance.**

   2.1. Third Party agrees to be bound by all of the obligations of a Recipient of Confidential Information of DMA and Distributors as the Discloser, as described in the section titled "Confidentiality" of the Agreement.

   2.2. Third Party agrees to sign any additional agreements deemed necessary in the sole discretion of DMA and the Distributors.

3. **Term of Third Party Confidentiality Agreement.**  Third Party's obligations under this Third Party Confidentiality Agreement to keep Confidential Information in confidence shall terminate on the 10th anniversary of the Date of the Agreement, except with respect to trade secrets of DMA and Distributors which at that time remain protected from disclosure by law.   Third Party shall remain obligated to keep valid trade secrets in confidence at all times.

Third Party:

_____

By _____

Its _____

Date: _____